[No. 14078. Department Two. August 29, 1917.]

THE STATE OF WASHINGTON, *Respondent*, v. GREAT
NORTHERN RAILWAY COMPANY, *Appellant*.[1]

INTOXICATING LIQUORS—UNLAWFUL SHIPMENT—SEIZURE. A search
and seizure proceeding against intoxicating liquors shipped into the
state is a proceeding *in rem*, governed by the rules in civil procedure.

SAME—UNLAWFUL SHIPMENT—DUTY OF CARRIER—INTERSTATE SHIP-
MENTS. Under Rem. Code, § 6262-24, providing that the prohibition
law shall not apply to shipments by common carriers in unbroken
packages in continuous transit through this state, it is the duty of
a common carrier to accept a shipment of liquor at Butte, Montana,
for shipment to Alaska, unless it knew that the goods were intended
to be diverted for delivery within the state of Washington under cir-
cumstances making them contraband.

SAME—INTERSTATE. SHIPMENTS—SEIZURE — BURDEN OF PROOF. In
proceedings to seize from a common carrier a shipment of liquor
billed from Butte, Montana, to Alaska, and *prima facie* an interstate
shipment, permitted by Rem. Code, § 6262-24, exempting such ship-
ments from the application of the prohibition law, the burden was
upon the state to show that the goods were contraband and not a
*bona fide* interstate shipment, notwithstanding Id., § 6262-12, which
casts the burden of proof upon any person claiming any interest. in
the goods to show by competent evidence his property right therein,
and that the articles were not used in violation of the act; as the
later act was satisfied, so far as the carrier was concerned, by show-
ing its contract of carriage and meeting the requirements of Id.,
§ 6262-24.

SAME—ILLEGAL SHIPMENTS—EVIDENCE—SUFFICIENCY. While it is
a suspicious circumstance that an interstate shipment of liquor from
Butte, Montana, to Alaska, was routed by an unusual route in care
of an auto delivery company at M. in this state where there were
no facilities for transshipping to a connecting carrier for transit to
Alaska, the carrier would not be bound to deliver to an irresponsible
delivery company, and was bound to perform its contract of carriage,
if possible, and was therefore justified in notifying the consignor of
the conditions at M. and in waiting for instructions for delivery to
some steamer line for transit to Alaska; hence such fact is not suf-
ficient to show that the carrier was in the unlawful possession or
engaged in the unlawful carriage of liquors, or knowingly engaged
in any illegal delivery of liquors within this state.

[1]Reported in 167 Pac. 103.

Appeal from a judgment of the superior court for Snohomish county, Alston, J., entered November 29, 1916, upon findings in favor of the plaintiff, in proceedings to confiscate liquor shipped into the state in violation of the state-wide prohibition law, tried to the court. Reversed.

*F. G. Dorety* and *R. J. Hagman*, for appellant.

*Lloyd L. Black, Clifford Newton,* and *O. T. Webb*, for respondent.

Holcomb, J.—This is an action *in rem*, commenced by the state by search warrant, against appellant to confiscate a carload of whiskey found on the side track at appellant's station of Meadowdale, Snohomish county, Washington, on October 16, 1916, as being there in violation of initiative measure No. 3. There is practically an agreed state of facts in the case, brought about either by the answer of the respondent to the claim filed by the appellant or by the unchallenged testimony of the witnesses produced by the parties.

The appellant is a common carrier of freight, operating a railway between Butte, Montana, and Meadowdale and Seattle, Washington. On October 4, 1916, one John Morton delivered to the appellant at Butte, Montana, a shipment of whiskey, consisting of 10 barrels and 190 cases of the same. This was delivered with instructions to ship the same to one Hans Apsch at Ketchikan, in the territory of Alaska, via the appellant's railway to Meadowdale, in Snohomish county, Washington, in care of the Auto Delivery Company. A bill of lading was issued by the appellant for the shipment of whiskey, and it conformed to the instructions given by the consignor. This bill of lading was delivered to Morton at Butte, and was apparently accepted by him. The whiskey was then loaded upon Great Northern car No. 16,686 and shipped from Butte to Meadowdale. Meadowdale is a mere station upon the line of the Great Northern Railway in Snohomish county, between Seattle and Everett, on Puget Sound.

There is, according to the testimony, no shipping terminal for boats at Meadowdale. The car containing the shipment arrived at Meadowdale on October 14, 1916. There was some evidence that it had been broken into *en route* through the state of Montana and about nine cases of the liquor removed. On October 17, the liquor was seized under a search warrant and was removed to the county jail.

It would appear from the evidence introduced by appellant that, on October 14, the company was notified by its agent at Meadowdale of the arrival of the carload of liquor. The agent gave this notice by wiring to M. J. Costello, assistant traffic manager of the appellant, who was in complete charge of such matters for the company at Seattle. In this telegram the agent stated that the car had arrived, that there was no permit on it, that there was no one at Meadowdale by the name of Apsch, and asked advice of his superior as to what should be done with the liquor. This agent was not called as a witness by either party. The agent was immediately ordered by one in the office of Costello to divert the shipment to Seattle, and advised that the office in Seattle would arrange at Seattle for delivery to a boat line there for the purpose of delivery in Alaska. There then followed a series of telegrams from Costello to the agent at Butte, and to the consignor, Morton, stating that the railway company could not deliver the goods to the Auto Delivery Company at Meadowdale, and asking them to designate a water carrier to whom delivery should be made direct for carriage to Ketchikan. On the 16th, when these various telegrams were sent, Costello wired the agent at Meadowdale to hold the shipment there, and not to make delivery to any one without taking the matter up with him. The appellant's officers state that this was their policy in dealing with liquor shipments—to deliver them to a water carrier and not to transfer companies. At this juncture the liquor was seized by the sheriff.

After the seizure, the railway company, on November 11, 1916, filed its claim to the whiskey seized, on the ground that

it had a lien thereon for its freight in the sum of $235.41 for the transporting of the whiskey from Butte to Meadowdale, and further, because the shipment was one in interstate commerce and, as such, was subject not to the laws of the state of Washington, but to the laws of the United States. Upon answer by respondent, the issues were joined and a trial had to the court. The court found that the shipment of liquor was not in interstate commerce *bona fide*, but was intended for unlawful disposition in the state of Washington.

Appellant bases its appeal upon the findings of fact as made by the court, and the conclusion of law

"That the said defendant violated the spirit of the initiative Measure No. 3 of the laws of the state of Washington in accepting the consignment of liquor billed as it was; that said liquor was to be disposed of contrary to law and was to be used for an unlawful purpose, and therefore should be confiscated and destroyed as provided by law;"

and the refusal by the court of proposed findings and conclusions to the contrary effect.

There is no evidence on the part of appellant which shows any further direction from the consignor than that received by it on October 4, 1916, when the whiskey was delivered to it for carriage. There is no evidence that the consignor or the consignee ever attempted to make any claim to the liquor, although a month elapsed between the time of the seizure and the trial. It was certainly within their rights under the law to have done this. Rem. Code, §6262-12. The only grounds that appellant had for filing a claim were that its freight charge was unpaid, and that the shipment was an interstate one beyond the state. The rate from Butte to Seattle was the same as that from Butte to Meadowdale. There was not any auto truck line running from Meadowdale to Ketchikan, Alaska. Practically all business for Alaska transported by appellant on its lines is interchanged in Seattle and carried by boat to Alaska. No boat docks at Meadowdale; there is no dock there, and no facilities whatever for transferring to a boat line.

A search and seizure proceeding is a proceeding *in rem,* the complaint, if one is required, ordinarily being in the nature of a libel in form similar to a criminal action, in that it is prosecuted by the state against the property devoted to an alleged unlawful or criminal use, with the state in the exercise of its police powers as plaintiff, as in other cases of violation of the criminal laws; but the proceeding is governed by the rules in civil procedure. *Steward v. State,* 180 Ind. 397, 103 N. E. 316; *Campbell v. State,* 171 Ind. 702, 87 N. E. 212; *Regadanz v. State,* 171 Ind. 387, 86 N. E. 449; *Clement v. Two Barrels of Whiskey etc.,* 136 App. Div. 291, 120 N. Y. Supp. 1044; *Farley v. Sixteen Bottles of Champagne,* 153 App. Div. 502, 138 N. Y. Supp. 276; *In re Zinzow,* 18 Misc. Rep. 653, 43 N. Y. Supp. 714.

Appellant stands upon the proposition that the state has no authority to interfere with a shipment of liquor in interstate commerce while passing through this state from one point without the state to another point without the state, under § 8 of art. I, of the United States constitution.

Section 24 of initiative measure No. 3 is cited as recognizing the immunity of interstate commerce shipments in providing that the act shall not apply to shipments transported by any common carrier in unbroken packages of intoxicating liquor in continuous transit through this state from a point outside of the state to another point outside of the state. There can be no doubt that, if the liquor was destined to be delivered to any one within this state, it was contraband; and if appellant had knowledge, or had reason to believe, that such delivery was intended, the contraband could be seized and confiscated in whosesoever hands it was found within this state. The Webb-Kenyon act of Congress of March 1, 1913, chapter 90, removes the protection of the interstate commerce clause of the constitution from such contraband shipments and waives the Federal authority and control in favor of the state to absolutely control or prohibit such shipments in the supremest manner. *Clark Distilling*

*Co. v. Western Maryland R. Co.,* 242 U. S. 311, Ann. Cas. 1917B 845, L. R. A. 1917B 1218.

A common carrier of goods is bound to accept goods tendered to it as a common carrier at any of its regular places of receiving such goods (except goods inherently dangerous or contraband goods), and carry the same to destination, or to the end of its line, and there deliver or offer to deliver them to some common carrier engaged in such business, to be by it forwarded or carried to their ultimate destination. 4 R. C. L., p. 668, § 145. This is the statement of a well known and accepted principle relating to common carriers; and thus it will be seen that, when the liquor in question was offered to appellant at its receiving place in Butte, Montana, for shipment to Ketchikan, Alaska, it was the duty of appellant as a common carrier to receive and accept the goods, unless it knew that the goods were intended to be diverted for delivery within the state of Washington where, as they were not protected by the permits required by the statutes of Washington, such shipment would be contraband.

As will be seen from the statement of facts, there is no evidence that the appellant had any notice or knowledge that the shipment was to be diverted from Ketchikan, Alaska, to some one in this state, unless it was derived from the fact that the goods were billed by the consignor to the "care of" a concern called the Auto Delivery Company and the destination of the carriage of the goods by the receiving carrier was made a wayside station in this state where no transshipping facilities existed.

The questions then arise: What was the duty of appellant under the circumstances? If the contract was a legal one in its inception, when, if at all, did it become illegal? And when, if at all, did the carrier's possession of the liquor become unlawful? If it was a legal contract of shipment, it was a contract which the parties thereto could enforce. The duty of the carrier, as the bailee of the consignor, was to do all in its power to safely deliver the goods at the place of destination,

viz., Ketchikan, Alaska, if it was a *bona fide* shipment to that place, and to prevent delivery to, or diversion by, any one else.

In a proceeding such as this, the object of which is to confiscate the goods as contraband, the burden was upon the state, in view of the *prima facie* character of the shipment as an interstate shipment, at least to prove that such was not the case, since §24 of the prohibition act, Laws 1915, page 15 (Rem. Code, § 6262-24) provides that the prohibitory provisions "shall not apply to shipments transported by any common carrier of unbroken packages of intoxicating liquor in continuous transit through this state from a point outside of the state to another point outside of the state." It is true that another section (Id., § 6262-12) casts the burden of proof upon the hearing, when such goods are seized, upon any person claiming any interest in any of the articles seized and filing a written claim thereto, to show by competent evidence his property right or interest in the articles claimed, and that the same were not used in the violation of any provisions of the act and were not in any manner kept or possessed with the intention of violating any of the provisions of the act. Appellant, as a common carrier, had no property interest in this shipment except its right to collect the freight tolls thereon and a lien therefor before delivery. If its contract was a contract of interstate commerce shipment, as soon as it showed that fact it met the requirements of § 24 protecting interstate commerce shipments in unbroken packages in continuous transit; always conditioned that the contract of shipment was a valid contract and in good faith. So far as the original carrier is concerned, the character of the shipment as to being interstate or not is determined by the destination named in the bill of lading. *Enright v. Atchison, T. & S. F. R. Co.*, 96 Kan. 546, 162 Pac. 629; *Stockton Elevator & Shipping Ass'n v. Missouri Pac. R. Co.*, 97 Kan. 235, 154 Pac. 1126. In the latter case, it was said that shipments of goods consigned to a point in another state consti-

tute interstate commerce, *notwithstanding an actual delivery is made before a state line is crossed.* While that statement is doubtless true as to ordinary goods and under legal contracts of shipment, we do not think it would be true as to illegal contracts or shipments of contraband goods to be delivered where delivery was unlawful, and the contract of delivery at such place would therefore be illegal, even though in general such delivery before arrival at destination named in the original contract could be enforced as within the contract.

Here the good faith of appellant is in no wise questioned. It is no doubt a very suspicious circumstance, at least, that the liquor was consigned in care of a concern called Auto Delivery Company, at Meadowdale, Washington, a concern which had no existence and did no business there, and that it was consigned to a place which had no facilities for transshipping to a connecting carrier for transit to Alaska. It is said that the agents of appellant at Butte were bound by presumed notice of the conditions existing at Meadowdale, a station on appellant's line. That we doubt, although we concede that the managing officers of appellant would be bound by presumed notice of such conditions; and it was shown as a fact that, as soon as one of the managing officers or agents of appellant discovered the nature of the shipment and of the contract or bill of lading under which it was shipped, he took steps to communicate with the consignor for instructions for the transfer of the liquor to a connecting carrier for Ketchikan. The appellant was not bound to deliver the liquor, under the suspicious circumstances, to an irresponsible auto delivery company nor to any one else at Meadowdale; but had a right, under the circumstances and in view of the law as it existed in this state, to take precautions to see that the law of this state prohibiting the unlawful possession or delivery of intoxicating liquor was not violated. *Cincinnati & T. P. R. Co. v. Rankin,* 241 U. S. 319, L. R. A. 1917A 265. And this, we think, appellant's agents at-

tempted to do. Under such circumstances, the carrier had a right to cause a diversion or a deviation from the designated route of carriage.

It is elementary learning that, in the absence of any special contract or obligation, a carrier of goods is bound to transport them by the usual and customary route proposed by him to the public, without any unnecessary deviation. 4 R. C. L. 812. In this instance the shipment was not routed by the usual and customary route, that is, by way of Seattle, and thence specifying a connecting steamer line to Ketchikan; but was routed by an unusual route by way of a wayside station and an auto delivery line. Having in view the law forbidding unlawful possession and unlawful delivery of intoxicating liquors, appellant was justified in proceeding as it did; that is, in notifying the consignor of the impossibility of delivery or transferring the liquor at Meadowdale and the necessity of delivering it to some steamer line at Seattle. 4 R. C. L. 814. It is true no answer or directions were received from the consignor within the two days elapsing before the seizure, for the future delivery and carriage of the shipment, and that is pressed as signifying abandonment by the consignor; but the responsibility of the appellant as a common carrier engaged in interstate commerce carriage did not cease there. It had the legal control of the shipment until it had performed its contract of carriage, or until that contract had become legally impossible of performance. *Gulf, C. & S. F. R. Co. v. Texas,* 204 U. S. 403. It had engaged to deliver the consignment at least to some carrier connecting with it which would carry it to Ketchikan, Alaska; and should it fail to so safely carry the consignment until delivered to such responsible carrier, or until it clearly appeared that no such "continuous transit through the state to a point outside the state" was intended, its failure so to do would subject it to an action on the part of the consignor or the consignee, unless the consignor could be clearly shown to be in collusion with his consignee for the purpose of frustrat-

ing and circumventing the laws of Washington by transporting and delivering intoxicating liquor illegally into the state. To show such a state of affairs in a confiscatory proceeding such as this, we consider the burden to be upon the state, as against the common carrier engaged *prima facie* in interstate commerce.

We are forced to the conviction that there is no evidence justifying a finding that the appellant was engaged in the carriage of the intoxicating liquors in question illegally, or that its contract of carriage was illegal, or that it possessed the liquor illegally, or that it was knowingly engaged in any illegal delivery of intoxicating liquors within the state. Unless such state of facts were established, the seizure was illegal. From our knowledge of local conditions, environments, and the laws of the state, we realize that the situation here presented contains suspicious circumstances indicative of a nefarious scheme on the part of the consignor to defeat the law. There must be something more than mere suspicion, however, to establish a case justifying the seizure and confiscation of goods as contraband while in possession of a common carrier as an interstate shipment.

The judgment must be reversed, and it is so ordered.

ELLIS, C. J., PARKER, and MOUNT, JJ., concur.